# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY KAHL, Administrator of the Estate of Heather Kahl, | ) ) ) ) | CASE NO.  1:18-cv-2731 |
| PLAINTIFF, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) | **MEMORANDUM OPINION** |
| SPECTRUM SECURITY, LLC, dba Spectrum, et al., | ) ) ) ) | |
| DEFENDANTS. | ) | |

Before the Court are the following cross-motions for summary judgment:

- the motion of defendants Spectrum Security, LLC, TWC Security, LLC, TWC Security, Inc., and Charter Communications, Inc. (collectively, "Spectrum" or "defendants") (Doc. No. 76 ["Defs. MSJ"], which plaintiff Jeffrey Kahl ("Kahl" or "plaintiff"), Administrator of the Estate of Heather Kahl, has opposed (Doc. No. 86 ["Pl. Opp'n"]), with Spectrum filing a reply (Doc. No. 89 ["Defs. Reply"]); and

- Kahl's motion for partial summary judgment on the issues of Spectrum's negligence per se and proximate cause (Doc. No. 85 ["Pl. PMSJ"]), which Spectrum has opposed (Doc. No. 87 ["Defs. Opp'n"]), with Kahl filing a reply (Doc. No. 88 ["Pl. Reply"]).

For the reasons set forth below, plaintiff's motion (Doc. No. 85) is denied; defendants' motion (Doc. No. 76) is granted.

## I.    Introduction

Heather Kahl ("decedent" or "Heather") had a Time Warner Cable ("TWC") IntelligentHome system installed in the residence that she shared with her husband, plaintiff

Kahl, and their two daughters. The system included a free smoke detector. Heather died from smoke inhalation resulting from a fire on October 29, 2017.

Kahl, as administrator of Heather's estate, brought this lawsuit seeking to hold Spectrum, which acquired TWC in 2016, responsible for damages in relation to the fire. In the complaint, as amended, Kahl asserts the following claims: negligence; survivorship; punitive damages; breach of implied warranty of merchantability; breach of implied warranty of fitness for a particular purpose; violation of Consumer Sales Practices Act; product liability; gross negligence; and breach of contract—unworkmanlike performance.[1]

> The central issue in a wrongful death action is whether a person's "wrongful act, neglect, or default" caused the death of another. *See* R.C. 2125.01. To bring a wrongful death action upon a theory of negligence, the plaintiff must show (1) the existence of a duty owing to the plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of the duty and the death."

*Thompson v. Wing*, 637 N.E.2d 917, 923–24 (Ohio 1994).

Spectrum claims that its only possible liability lies in contract—not tort—and, therefore, it is entitled to summary judgment on any claim sounding in tort. According to Spectrum, the IntelligentHome system was installed in 2013 after Heather entered into a contract with TWC, which provided that the free smoke detector supplied with the system was a promotional add-on explicitly not intended to be a primary or code-compliant fire safety system. In addition, Spectrum claims that the smoke detector began to send dying battery signals in the summer of 2017 but, despite Spectrum reaching out to Heather with several notices of the problem and with free replacement batteries, there is no evidence that Heather

---

[1] The amended complaint also seeks punitive damages.

2

ever replaced the batteries, and she affirmatively canceled a service call that Spectrum set up for July 16, 2017.

Plaintiff Kahl denies any contract, arguing that Spectrum has failed to produce evidence of its existence. Even so, plaintiff argues that, if there was a contract, besides being unenforceable against Heather's heirs (who have viable tort claims for their own losses), the contract is also generally unenforceable because it violated Ohio law and public policy. Plaintiff argues that the smoke detector was not code-complaint and was fundamentally defective under Ohio's product liability statute, rendering Spectrum negligent per se. Plaintiff claims that, if the smoke detector had been functioning properly, Heather's life would have been saved because she would have received adequate warning to escape the residence before any flames erupted.

## II.    Factual Background

Plaintiff Kahl was the husband of Heather (together, the "Kahls") and they had two minor children. This lawsuit was brought due to Heather's death from smoke inhalation (at the age of 41), resulting from a residential fire that occurred on October 29, 2017. (*See* Doc. No. 85-11, Ohio State Fire Marshal Incident Report ("Incident Report"); Doc. No. 85-12, Coroner's Report of Death Investigation ("Coroner's Report").)

In 2003, the Kahls purchased the two-bedroom, single story, 844-square-foot house at 777 Abbott Drive in Mansfield, Ohio, where the family lived until the fire. (Doc. No. 77-1, Deposition of Jeffrey N. Kahl ("Kahl Dep.") at 1089 (8–9); 1100 (51).[2]) Before they

---

[2] Where deposition transcripts, such as this one, are in the format of four pages to every one ECF page, the Court will cite first to the Page ID# assigned by ECF, followed by the actual deposition page number in parentheses. All other record citations herein will also be to the Page ID# of the respective document(s).

purchased a TWC IntelligentHome system, there was a single smoke detector in the main level center hallway of the home and one in the basement. Kahl removed the basement smoke detector in 2005–06 during remodeling and it was never replaced. (*Id*. at 1102 (60); 1103 (62–64); 1104 (69).)

In 2008, Kahl took a job that required him to travel away from home for extended periods. (*Id*. at 1092 (21); 1096 (37); 1113–14 (105–06).) For that reason, and because Kahl had valuable antique cars in his garage, the Kahls wanted additional security. They originally contracted with ADT; Kahl was unaware whether that system included fire protection. (*Id*. at 1114 (106).)

In 2013, Heather decided to switch the Kahls' home security system from ADT to TWC, as they had already subscribed to cable TV through TWC since 2003 and Heather wanted to bundle all their services. After consulting with Kahl, Heather chose TWC's IntelligentHome product. (*Id*. at 1113 (102); 1115 (112–13).) TWC employee Michael Blaney ("Blaney") installed it on October 31, 2013. Heather was home at the time, but Kahl was not. (Doc. No. 66-1, Deposition of Michael Blaney ("Blaney Dep.") at 321–22 (73–74).) Kahl testified that the smoke detector was installed on the ceiling in the same center hallway of the home where the original smoke detector had been. He also noted that Blaney had removed the original smoke detector and installed the TWC detector in its place. (Kahl Dep. at 1120 (133).)

At his deposition, Blaney had no specific recollection of the installation. He vaguely recalled some of Heather's physical characteristics and that "there was a bunch of car stuff around." (Blaney Dep. at 321–22 (73–74).) Otherwise, Blaney testified mostly as to the

4

typical routine he would have followed to complete the IntelligentHome installation based on TWC policy and his training. (*Id*. at 325 (88).)

IntelligentHome was a wireless system consisting of a control unit (in the form of a touchscreen), a modem, a motion detector, three door/window sensors, and one free smoke detector. (*Id.* at 322 (74–75); 324 (84); *see also* Doc. No. 85-21, IntelligentHome brochure.) Additional smoke detectors were available for purchase but, according to Blaney, most customers declined the offer. (Blaney Dep. at 318 (58).) Blaney testified that, if a home did not have a primary smoke detection system, he would not install the free smoke detector because it was intended to be only secondary protection. (*Id*.) Although Blaney does not remember whether the Kahl residence had a smoke detector, he assumes it had at least one since he installed the free one that was part of the package. (*Id*. at 325 (89); 329 (104–05).)

Blaney's standard procedure was to provide the customer with a welcome kit that had "all the literature in it and legal mumbo-jumbo[,]" with the expectation that the customer would read it while he installed the system; he did not offer the customer any explanation of the contents of the welcome kit. Blaney would then have the customer sign or initial an electronic version of TWC's work order after the installation was completed. (*Id*. at 315–16 (49–51).)

On the day before the fire in October 2017, Kahl was out of town and Heather had arranged for the children to sleep at their grandmother's house. Heather made plans to go out with her sister, Kristina Harrison ("Kristy"), who was visiting from out of town, and Heather's

girlfriend, Adrienne.[3] They planned to watch an Ohio State football game at a local sports bar. With Adrienne driving, they visited two bars where they ate and also drank several beers over the course of the evening. For convenience, Heather left her purse in Adrienne's car and she gave her phone to Kristy for safekeeping. Around 10:00 p.m., because Adrienne had already left, Kristy's husband picked up Kristy and Heather and drove them home. Heather forgot to retrieve her phone from Kristy, and Kristy only discovered it in her purse on the morning of the fire, when Kahl called the phone. (Kahl Dep. at 1126–27 (156–59); Harrison Dep. at 1163 (9); 1169–75 (35–59; 73–75).)

On October 29, 2017 at approximately 5:33 a.m., the Kahls' neighbor reported a fire at 777 Abbott. (Doc. No. 85-13, Mansfield Fire Report ("Fire Report") at 1865; Incident Report at 1849.) By the time the fire department arrived at approximately 5:38 a.m., the fire was "through the roof[] . . . in the center of the house, free burning from the floor and extending up and out the peak of the roof." (Fire Report at 1867.) Heather, the only occupant home at the time, was found on the floor behind, and blocking, the front door. (*Id.*) She had likely been sleeping on the couch in the living room, as was often her practice when Kahl was out of town. (Kahl Dep. at 1112 (99–100).) Heather did not survive the fire, dying of smoke inhalation. Following her death, Heather was found to have a blood alcohol level of 0.163. (Coroner's Report at 1858, 1864.)

The fire is thought to have originated "in or near a small closet and attic stairwell located near the northwest corner of the kitchen." (Incident Report at 1852.) The cause of the

---

[3] This person's name is spelled both "Adrienne" and "Adrianne" in different depositions. *Compare* Doc. No. 78-1, Deposition of Kristina Harrison ("Harrison Dep.") at 1170 (37) *to* Kahl Dep. at 1126 (156). From the context of testimony in each deposition, there is no reason to believe this is not the same person.

fire was officially "undetermined." (*Id*. at 1854.) Despite significant damage to the kitchen and a portion of the roof of the house above the place of origin of the fire (and fire debris below), most of the remainder of the house (including the living room where Heather had been sleeping), as well as the home furnishings, had relatively little actual fire damage. Rather investigations revealed only "appreciable accumulation of smoke on the ceiling and walls[.]" (*Id*. at 1853; *passim*.)

## III.    Discussion

### A.    Standard of Review

The standard for evaluation of motions for summary judgment does not change when, as here, there are cross-motions for summary judgment. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

*Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quotation marks and citations omitted).

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence

or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

### B. Kahl's Motion for Partial Summary Judgment (Doc. No. 85)

#### 1. Negligence Per Se

Kahl moves for summary judgment, seeking a conclusion by this Court that Spectrum was negligent per se in violating Ohio Rev. Code §§ 3737.51 and 3737.65, which provide in relevant part:

> No person shall knowingly violate any provision of the state fire code or any order made pursuant to it. (§ 3737.51(A).)

> No person shall sell, offer for sale, or use any fire protection or fire fighting equipment that does not meet the minimum standards established by the fire marshal in the state fire code. (§ 3737.65(A).)

Kahl argues that, "[i]n Ohio, 'it is well [established] that where a legislative enactment imposes a specific duty for the protection of others, a person's failure to observe that duty constitutes negligence *per se*.'" (Pl. PMSJ at 1735 (quoting *Gressman v. McClain*, 533 N.E.2d 732, 735 (Ohio 1988)[4]).) He claims that "[f]ire codes are the type of safety statute whose violation gives rise to negligence per se." (*Id.* (citing *Shump v. First Continental-Robinwood Assoc.*, 644 N.E.2d 291 (Ohio 1994);[5] *Burdick v. Nevel*, No. 98AP-697, 1999 WL 235435

---

[4] In *Gressman*, the relevant statute then provided that no sales of beer or intoxicating liquor "shall be made to an intoxicated person." Ohio Rev. Code § 4301.22(B). The complaint alleged that the defendants had violated this statute by serving alcohol to a visibly intoxicated individual who caused a vehicle accident that killed herself and plaintiff's decedents. At the close of the plaintiff's case, the trial court granted a directed verdict in favor of the defendants and the court of appeals affirmed. The Ohio Supreme Court reversed the decision, noting that the statute "unequivocally declares that no sales of alcohol shall be made to an intoxicated person." *Gressman*, 533 N.E.2d at 735.

[5] In *Shump*, the Ohio Supreme Court determined that "the obligations imposed upon a landlord under R.C. 5321.04 would appear to extend to tenants *and* to other persons lawfully upon the leased premises." *Shump*, 644 N.E.2d at 297. Thus, the court defined the contours of the landlord's already-existing legal duty.

(Ohio Ct. App. Apr. 20, 1999)[6].) Kahl claims that *Burdick* is particularly instructive because "it dealt with the law requiring the installation of smoke detectors in an apartment." (*Id.*)

In opposition, Spectrum properly points out that Kahl's second amended complaint does not include a claim of negligence per se. (Defs. Opp'n at 2330.) Although some Ohio courts do not require that such a claim be pleaded separately from negligence, *see, e.g.*, *Collier v. Libations Lounge, L.L.C.*, No. 97504, 2012 WL 1952262, at \*5 (Ohio Ct. App. May 31, 2012), in a diversity case such as this one, federal procedural rules apply and require that the plaintiff plead sufficient facts to establish that a claim for relief is plausible on its face. (Defs. Opp'n at 2330 (citing cases).)

To establish a claim of negligence per se under Ohio law, "the plaintiff must show (1) a violation of a statute, (2) the violation of the statute proximately caused the plaintiff's injuries, and (3) the defendant knew or should have known of the factual circumstances that proximately caused said injuries." *Capella v. Historic Developers, LLC*, No. CA2017–07–109, 2018 WL 826921, at \*7 (Ohio Ct. App. Feb. 12, 2018).

Here, both count one of the complaint (alleging general negligence) and count eight (alleging gross negligence) are based on a "common law duty to exercise ordinary and reasonable care in the marketing, installation, service, monitoring, and maintenance of the home security system and the smoke detector." (Doc. No. 26, Second Amended Complaint ("SAC") ¶¶ 11, 47.) Neither count makes reference to any statute that defendants allegedly violated, much less supplies any allegations as to how such statute might impose a specific

---

[6] *Burdick* also involved a landlord/tenant situation where the legal duty was defined by Ohio Rev. Code § 5321.04.

duty on defendants for the protection of others, or how the defendants may have failed in such duty.

Kahl first identifies the statutes and administrative code sections[7] he relies upon in his dispositive motion. (Pl. PMSJ at 1727.) This is insufficient, despite Kahl's argument in his reply brief that he need not separately plead a negligence per se claim. (Pl. Reply at 2353– 56.) While that may or may not be true, he does have the burden of pleading all the elements that he will need to prove, including which statute was violated and why it places a specific duty on Spectrum. Absent that, defendants have not been placed on notice that they may be found negligent *per se*.

Even the case relied upon by Kahl for the proposition that "the doctrine of negligence *per se* is never, by itself, a basis for liability[,]" (*Id*. at 2355 (quoting *Myers v. United States*, 17 F.3d 890, 899 (6th Cir. 1994)), offers no support for plaintiff's position. In *Myers*, the court pointed out that "a plaintiff, whether under state law or [federal law], must first establish the existence of a relationship giving rise to a duty before attempting to rely on the doctrine of negligence per se to establish the standard of conduct required." *Myers*, 17 F.3d at 899. "[N]ot every violation of a law or ordinance constitutes negligence per se. When a rule of conduct is set forth in general or abstract terms, the liability standard is one of due care and negligence *per se* is not applicable." *Bonner v. Reliable Transp. Specialists, Inc.*, No. 3:17-cv-415, 2018 WL 4586924, at *3 (N.D. Ohio Sept. 25, 2018) (internal citation omitted) (holding that plaintiff's failure to elaborate on violations of alleged legislative enactments or offer factual

---

[7] In *Chambers v. St. Mary's School*, 697 N.E.2d 198, 203 (Ohio 1998), the court held that "the violation of an administrative rule does not constitute negligence *per se*[,] . . . [although it] may be admissible as evidence of negligence."

allegations connecting alleged statutory violations to the accident resulted in dismissal of negligence per se claim); *Eisenhuth v. Moneyhon*, 119 N.E.2d 440, 443 (Ohio 1954) (noting that "the rule is that where a legislative enactment imposes upon any person a specific duty for the protection of others, and his failure to perform that duty proximately results in injury to another, he is liable per se or as a matter of law to such other for the injury"). Here, even if Kahl had sufficiently pleaded negligence per se, which he has not, the statutes relied upon are general in nature and are insufficient to establish any specific duty on the part of Spectrum in relationship to Kahl.

Kahl is not entitled to summary judgment on negligence per se and, to that extent, his motion for partial summary judgment is denied.

### 2. *Proximate Cause*

Kahl also seeks summary judgment on the question of proximate cause, arguing that the experts opine that Heather would have survived the fire had the smoke detector worked as it was intended to work. (Pl. PMSJ at 1743.) Kahl claims that the evidence demonstrates "a clear cause and effect relationship between the failure of the smoke detector to work as intended and Heather's death by smoke inhalation[,]" as to which "reasonable minds could not differ[.]" (*Id*. at 1743, 1746 (capitalization omitted).)

The Court observes that the various fire investigators seem to agree[8] that there likely was a substantial period of smoldering (during which smoke would have been generated) before flames erupted. (Doc. No. 85-24, Paulus Engineering, Inc. Dwelling Fire Final Report

---

[8] This is not, however, to be construed as a conclusive finding by the Court.

at 2236 ("The fire was burning . . . before midnight on October 28, 2017.")[9]; Doc. No. 85-23, Churchwell Fire Consultants, Inc. Dwelling Fire Analysis (Fatal) Final Report at 2192 ("[T]he total time between the fire starting and the fire venting out of the attic was most likely 30 to 40 minutes."[10]) If that is so, a properly functioning smoke detector may have warned both Heather and the fire department in a timely fashion. Kahl argues that the unrebutted evidence is that, if the fire alarm system had worked properly, the fire department would have rescued Heather before she died of smoke inhalation. (Pl. MSJ at 1745.)

Spectrum argues that the evidence is rebutted and that there is, at the very least, a material factual dispute as to the proximate cause of Heather's death. In particular, Spectrum's expert, Dr. Stephen Packham, opined that Heather's 0.163% blood alcohol content contributed to her unsuccessful egress from the property. (Doc. No. 87-2, Report of Dr. Stephen Packham ("Packham Report") at 2349.)

The Court need not devote significant time to this issue. As Spectrum notes, at the very least, there is a material factual dispute with respect to the issue of the proximate cause of Heather's death. It is not a foregone conclusion, as Kahl asserts, that had there been a properly functioning smoke detector, Heather would not have died.

Kahl is not entitled to summary judgment on the issue of proximate cause and, to that extent, his motion is denied.

---

[9] This report was prepared for defendants.

[10] This report was prepared for plaintiff.

**C.** **Spectrum's Motion for Summary Judgment (Doc. No. 76)**

**1.** ***Plaintiff Cannot Refute the Existence of a Contract*** [11]

Spectrum claims that any relationship with Heather (and thus with Kahl) was defined by the agreement under which TWC installed and monitored the IntelligentHome system in the Kahls' home, but Kahl has failed to include any claims sounding in contract in his complaint.[12] (Defs. Mot. at 979.)

Kahl notes that, for purposes of its own motion for partial summary judgment, evidence of a contract must be construed most strongly in favor of Spectrum, the opposing party; but for purposes of Spectrum's dispositive motion, the evidence must be construed in Kahl's favor, which, according to Kahl, results in a material factual dispute over whether there was a contract. (Pl. Opp'n at 2295.) In its reply, Spectrum argues that, "[a]part from squarely contradicting the allegations of the complaint, . . . the plaintiff offers no other possibility for how any relationship between Heather Kahl came to exist if not by contract." (Defs. Reply at 2366.) This argument has meritand, notably, in his own motion (discussed earlier in this opinion) Kahl does not actually argue that there *was* no contract, but only that Spectrum failed to *produce* it. (*See* Pl. PMSJ at 1730–31.) Kahl offers no explanation for why TWC would have installed the IntelligentHome system in the Kahls' home absent a contract to do so. Nor

---

[11] Neither party seeks summary judgment specifically on any contract issue because plaintiff has not alleged any contract claim. Even so, because Kahl especially made much of whether Spectrum has established the existence of a contract, the Court will separately address the issue before turning to the arguments in Spectrum's motion.

[12] Although the ninth count is styled as a breach of contract for unworkmanlike performance, the Ohio Supreme Court has held that a failure to perform under a contract in a workmanlike manner is an action in tort, not contract. *Velotta v. Leo Petronzio Landscaping, Inc.*, 433 N.E.2d 147, 150 (Ohio 1982).

does Kahl refute the following testimony of Kevin McCarthy, Spectrum's Vice President of Operations:

> Q:   Could you turn to page 41?
> A.   Four one?
> Q.   Yes. It's actually on page 41 and 42. And it appears to be some sort of three-page folding. I mean, do you recognize this?
> A.   This is the IntelligentHome addendum.
> Q.   So it's an addendum to what?
> A.   To the—this would be an addendum to the Time Warner Cable customer agreement.
> Q.   So is this something that, your understanding, would go along with every installation of IntelligentHome?
> A.   Yeah. It would be in the welcome kit.

(Defs. Reply at 2371 (quoting Doc. No. 71-1, Deposition of Kevin McCarthy ["McCarthy Dep."] at 106–07).)

The unrefuted evidence in the case is that there was a contract between Spectrum/TWC and Heather Kahl and that the contract would have been the same as the exemplars produced by Spectrum. (*Id.* at 2372.) *See Danley v. Encore Capital Grp., Inc.*, 680 F. App'x 384, 397 (6th Cir. 2017) (affirming district court's reliance upon an exemplar credit card agreement in granting defendant's motion to compel arbitration).

### 2.   *Plaintiff's Tort Claims Fail as a Matter of Law*

Spectrum argues generally that all of Kahl's claims must fail because they sound in negligence and gross negligence, but Spectrum owed no independent duty of care to Kahl.

Under Ohio law, "a tort exists only if a party breaches a duty which he owes to another independently of the contract, that is, a duty which would exist even if no contract existed." *Wolfe v. Cont'l Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981). "[O]nly in those contract

situations where a special or fiduciary relationship exists between the parties and imposes a duty of good faith will the breach of [contract] result in a tortious cause of action." *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 897 (6th Cir. 1996) (citation and quotation marks omitted).

In opposition, Kahl repeats the lengthy argument from his own motion that Spectrum has failed to establish the existence of a contract between it and Heather.[13] (Pl. Opp'n at 2291–95.) That said, Kahl also asserts that, even if there were a contract containing the provisions that Spectrum advances, it would be illegal and unenforceable in Ohio because it violates both law and public policy. (*Id.* at 2295 (citing cases).)

Kahl asserts that the contract's statement that "any smoke and/or fire sensors that TWC has installed are not compliant with local, state, or national fire codes either in their placement within my home or in connection with their technical functionalities[,]" (*Id.* 2295–96 (emphasis omitted)), is an admission of a violation of Ohio law. Kahl points to Ohio Rev. Code § 3737.65(A) (which is not mentioned in the second amended complaint). The statute provides: "No person shall sell, offer for sale, or use any fire protection or fire fighting equipment that does not meet the minimum standards established by the fire marshal in the state fire code." With no cited authority, Kahl claims that the minimum standards required at least four smoke detectors in the Kahls' home. (*Id.* at 2296.)

---

[13] There is no reason to believe, in light of this record, that the contract entered into by Heather would not have been the same as the authenticated exemplars produced by Spectrum. (*See* Defs. Reply at 2372.) It is often the case that complex business contracts exist only in exemplar form.

15

Kahl further insists that any contract, if it existed, would not apply to him and his children[14] and that Spectrum breached a separate legal duty created by the laws of Ohio, independent of any contract. (*Id*. at 2296–98, 2300.) As a result, according to Kahl, "this breach of a duty imposed by law constitutes negligence per se . . . [and] justifies the claims against Spectrum for negligence (Count One) and gross negligence (Count Eight)." (*Id*. at 2298.) All of the cases cited by Kahl for this proposition involve the special relationships of property owner/guest, landlord/tenant, insurer/insuree, accountant/client, and construction contractor/customer. This Court has held that "[t]he law imposes no similar duties of any kind on providers of alarm services under a contract." *Solid Gold Jewelers v. ADT Sec. Sys., Inc.*, 600 F. Supp. 2d 956, 962 (N.D. Ohio 2007) (collecting and distinguishing cases where the exception did apply). In *Solid Gold Jewelers*, this Court concluded that the plaintiff "[could] not maintain a separate action in negligence based on allegations that ADT failed to perform its contractual obligation with the requisite skill, care, and faithfulness." *Id*.; *see also Sprengler v. ADT Sec. Servs., Inc.*, 505 F.3d 456, 458 (6th Cir. 2007) (applying Michigan law); *Frost v. ADT, LLC*, 947 F.3d 1261, 1272 (10th Cir. 2020) (citing *Sprengler* and applying Kansas law).

The Court concludes that any duty owed by Spectrum with respect to the installation and monitoring of the smoke alarm arose under the contract between TWC and Heather, and not independently. *Am. States Ins. Co. v. Honeywell, Inc.*, No. 56552, 1990 WL 19319, at *4

---

[14] Ohio law recognizes, however, that "contractual obligations of a decedent which do not expressly terminate at the time of the decedent's death are binding on executors and administrators in their representative capacity." *Stoll v. Hostetler*, No. 2891, 1995 WL 19163, at *2 (Ohio Ct. App. Jan. 18, 1995) (citing *in re Estate of Basmajian*, 52 N.E.2d 985, 988 (Ohio 1944)). Kahl has pointed to no evidence that the agreement under which TWC installed the IntelligentHome system terminated at the time of Heather's death.

(Ohio Ct. App. Mar. 1, 1990) (although the security services company may have been negligent in the discharge of its contractual obligations, no separate duty existed between the parties to allow the plaintiff to pursue a tort theory of recovery). Ohio law does not support the existence of a separate duty owed by Spectrum "to refrain from willful or wanton misconduct, independent of its contractual obligations in this case." *Solid Gold Jewelers*, 600 F. Supp. 2d at 964.

Therefore, all of plaintiff's claims sounding in negligence (counts one, four, five, eight, and nine) fail as a matter of law.[15] Spectrum is entitled to summary judgment on all of these claims and, to that extent, its motion is granted.

### 3.  Plaintiff's Non-Statutory Claims are Preempted

Spectrum next argues that "when the Ohio General Assembly enacted the current version of the OPLA [Ohio Products Liability Act] . . . it abrogated all common law claims relating to product liability causes of actions[,]" including general negligence, failure to warn, implied and express breach of warranty, and punitive damages. (Defs. MSJ at 983–84 (quoting *Evans v. Hanger Prosthetics & Orthotics, Inc.*, 735 F. Supp. 2d 785, 795, 796–97 (N.D. Ohio 2010)).) Further, it is "the essential nature of the substantive allegations of [the] claims and not the artificial label that [is] attach[ed]" that delineates claims that are preempted. (*Id.* at 984 (quoting *Williams v. Bausch & Lomb Co.*, No. 2:08-cv-910, 2009 WL 2983080, at *3 (S.D. Ohio Sept. 14, 2009)).) Spectrum argues that, because the statutory language abrogating

---

[15] The Court, therefore, need not address Spectrum's assertion that the negligence-based claims also fail because, by ignoring all of its warnings about failing batteries, as well as its attempt to perform a service call, Heather assumed the risk. (Defs. MSJ at 982–83.)

common law product liability causes of action encompasses all of Kahl's common law claims, "those claims are extinguished." (*Id*. (quoting *Evans*).)

In opposition, citing *Wright v. Harts Mach. Servs., Inc.*, 69 N.E.3d 63 (Ohio Ct. App. 2016), Kahl argues only that he is permitted to plead both products liability and negligence claims as alternative theories of recovery. (Pl. Opp'n at 2308.)

Spectrum argues, in reply, that *Wright* is distinguishable because it was only *after* dismissing all of the plaintiff's products liability claims that the court there determined the plaintiff's other claims were not abrogated, whereas here plaintiff seeks recovery for common law claims that even he admits overlap with his product liability claims. (Def. Reply at 2375–76.)

Spectrum has the correct view. All of the non-statutory claims in Kahl's complaint are, in essence, product liability claims. "Courts routinely dismiss non-statutory product liability claims brought under Ohio law." *Evans*, 735 F. Supp. 2d at 796 (citing *Crisp v. Stryker Corp.*, No. 09–cv–02212, 2010 WL 2076796 (N.D. Ohio May 21, 2010); *Miles v. Raymond Corp.*, 612 F. Supp. 2d 913 (N.D. Ohio 2009)). This Court will do the same.

Spectrum is entitled to summary judgment on all of Kahl's non-statutory claims and, to that extent, its motion is granted.

### 4.    Plaintiff's Statutory Claims Fail as a Matter of Law

### i.    Consumer Sales Practices Act

Spectrum argues that Kahl's claim under the Consumer Sales Practices Act ("CSPA") fails both because Kahl has not alleged any unfair, deceptive, and/or unconscionable act by Spectrum and because the claim is barred by the two-year statute of limitations. (Defs. MSJ at 985–96.)

"An action under sections 1345.01 to 1345.13 of the Revised Code may not be brought more than two years after the occurrence of the violation which is the subject of the suit[.]" Ohio Rev. Code § 1345.10(C). The statute of limitations on an action for damages under the CSPA "begins to run when the violation occurs, not when the consumer discovers the violation." (Defs. MSJ at 985 (quoting *Quetot v. M & M Homes, Inc.*, No. 12 CO 1, 2013 WL 793219 at *3 (Ohio Ct. App. Feb. 25, 2013)).)

Plaintiff has failed to respond to this argument. Spectrum has the correct view. The security system was installed in October 2013. The allegations of the complaint are critical of the installation process and allege that Spectrum is liable due to the manner in which TWC recommended and performed the installation.

The CSPA claim in count six is time-barred. Spectrum is entitled to summary judgment on the CSPA claim and, to that extent, its motion is granted.

### ii.    Ohio Products Liability Act

There are three products liability claims in count seven of the second amended complaint: defective design under Ohio Rev. Code § 2307.75; defect due to inadequate warning or instruction under Ohio Rev. Code § 2307.76; and a supplier negligence claim

under Ohio Rev. Code § 2307.78. As Spectrum points out, in its one paragraph response, Kahl has "not attempted any meaningful development of this claim" (Defs. Reply at 2375). For this reason alone, Spectrum is entitled to summary judgment on these claims.

Spectrum also argues that each claim must fail because the cause of the fire was not the allegedly defective/defectively functioning smoke alarm. The fire would have occurred even if TWC had never installed the smoke alarm. Therefore, according to Spectrum, since the element of proximate cause is not established as to any of the products liability claims, the Court need not examine any other elements. (Defs. MSJ at 986.)

Again, Kahl makes no attempt to refute Spectrum's argument that any products liability claim must fail because, even if the smoke detector was defective in all the ways alleged by Kahl, there is no evidence that it was the cause of the fire.

There being no showing of proximate cause, Spectrum is entitled to summary judgment on Kahl's products liability claims in count seven and, to that extent, its motion is granted.

Separately, Spectrum argues that it is entitled to summary judgment on the product liability claims because (1) Kahl has not shown that Spectrum was the manufacturer of any product at issue; (2) Kahl has not produced sufficient evidence of the nature of any alleged defect and/or the availability of a feasible alternative; (3) Kahl has failed to overcome Spectrum's express warning that IntelligentHome was not a substitute for smoke alarms; and (4) Kahl cannot sufficiently establish that Spectrum was a supplier pursuant to Ohio Rev. Code § 2307.78. (Defs. MSJ at 986.) Spectrum is correct and is entitled to summary judgment on these claims for this separate reason.

### 4.     *Agreement Bars Plaintiff's Claims Irrespective of Recovery Theory*

Spectrum argues that, even assuming Kahl could proceed on one or more of his claims, any such claims would still be barred, or at a minimum limited, by the terms of the subscriber agreement between TWC and Heather. (Defs. MSJ at 987.)

First, Spectrum points to the exculpatory clause in Section 7(g), which provided:

> EXCEPT FOR THE SERVICE INTERRUPTION CREDITS DESCRIBED IN SECTION 4 OF THIS AGREEMENT, TWC WILL NOT BE LIABLE TO YOU FOR ANY LOSSES OR DAMAGES OF ANY KIND BASED ON BREACHES OF THIS AGREEMENT OR YOUR RELATIONSHIP WITH US, REGARDLESS OF THE BASIS OF ANY CLAIM, INCLUDING LOSSES OR DAMAGES CAUSED BY OR CONTRIBUTED TO BY OUR NEGLIGENCE (INCLUDING IN SELECTING, INSTALLING AND MONITORING THE EQUIPMENT) OR OUR ACTIONS OR FAILURE TO ACT UNDER ANY CIRCUMSTANCES (INCLUDING IN RESPECT OF SCHEDULING AND KEEPING INSTALLATION AND SERVICE CALLS).

(Doc. No. 76-1, Subscriber Agreement ("Agreement") at 1008 (capitalization in original).) Spectrum claims this clause is enforceable. (Defs. MSJ at 987–88 (citing *Pruitt v. Strong Style Fitness*, No. 96322, 2011 WL 4842485, at *4 (Ohio Ct. App. Oct. 13, 2011) (upholding an exculpatory clause, finding that it "[is] clearly set forth[;] . . . is on the front page[;] . . . is underlined to ensure it stood out from the rest of the non-underlined text[;] . . . specifically notifies [the customer] that he is waiving any claim for negligence[;] . . . [includes] a paragraph in bold type stating that [the customer] read and understood the terms of the rules and regulations prior to signing[;]" . . . [and that,] [a]t that point, [the customer] was free to walk away from the contract if he did not like the terms proposed[.]")).)

Next, Spectrum points to two warranty disclaimers in the Agreement. Section 7(d) provides that a subscriber may be entitled to a warranty for customer-owned equipment from

the original manufacturer, but makes clear that TWC "PROVIDES NO WARRANTIES WITH RESPECT TO THE CUSTOMER OWNED EQUIPMENT." (Agreement at 1008 (capitalization in original).) Section 7(e) further reiterates that TWC provides customer-owned equipment to the customer

> ON AN "AS IS" BASIS WITHOUT ANY WARRANTIES OF ANY KIND, INCLUDING SO-CALLED "IMPLIED" WARRANTIES (SUCH AS WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE). OUR SERVICES ARE NOT GUARANTEED TO WORK OR TO BE ERROR-FREE. THE SERVICES, EQUIPMENT AND SOFTWARE ARE PROVIDED "AS IS" AND "AS AVAILABLE" WITHOUT WARRANTIES OF ANY KIND.

(*Id*. (capitalization in original).) Spectrum argues that these, too, are enforceable. (Defs. MSJ at 988–89 (citing *Ohio Sav. Bank v. H.L. Vokes Co.*, 560 N.E.2d 1328, 1334 (Ohio Ct. App. 1989) ("When a seller is a merchant with respect to subject goods, a warranty of merchantability is implied in the sales contract as a matter of law unless it is excluded. R.C. 1302.27(A). Liability based on an implied warranty of merchantability may be disclaimed with language mentioning 'merchantability' and, if in writing, with language mentioning 'merchantibility' [sic] conspicuously.") (citations omitted)).)

Finally, Spectrum cites the limitation of liability clause in Section 7(h), providing that "TWC WILL NOT BE REQUIRED TO PROVIDE COMPENSATION TO YOU IN EXCESS OF $1,000 UNDER ANY CIRCUMSTANCES." (Agreement at 1008 (capitalization in original).) Spectrum asserts that Ohio courts enforce such clauses. (Defs. MSJ at 989–92 (citing *Nahra v. Honeywell, Inc.*, 892 F. Supp. 962, 969–70 (N.D. Ohio 1995) ("While viewed critically by the courts, limitation of liability clauses (including exculpatory clauses) may be freely bargained for in Ohio. And absent important public policy concerns,

unconscionability, or vague and ambiguous terms, [such] provisions will be upheld, so long as the party invoking the provision has not committed a willful or reckless breach.") (internal quotes and citations omitted)).)

Spectrum argues that the exculpatory clause, the warranty disclaimers, and the limitation of liability clause are all clear and unambiguous. It further argues that these clauses are enforceable and not unconscionable in view of the fact that the smoke detector service in this case was free and its value minimal compared to potential liability for negligence in the event of a fire. (Defs. MSJ at 988.) According to Spectrum, the Kahls were also free to negotiate for different terms and/or to use a different service, which they had done previously.

Kahl argues in opposition that all of the restrictive clauses in the Agreement are disfavored in Ohio and must be strictly construed against the party seeking to enforce them. (Pl. Opp'n at 2301–02 (citing *Samson Sales Inc. v. Honeywell, Inc.*, 465 N.E.2d 392 (Ohio 1984) and cases relying upon *Samson Sales*).)

As properly pointed out by Spectrum in its reply, *Samson Sales* dealt with a liquidated damages clause, not a limitation of liability clause. Courts since *Samson Sales* have rejected applying its analysis to the latter type of clause. (Defs. Reply at 2373–74 (collecting cases).)

Even if Kahl had asserted claims for breach of contract, which he has failed to do, the terms of the Agreement between TWC and Heather would have eliminated, or at least limited, Spectrum's liability. This is another ground for granting Spectrum's motion.

### 5. *Plaintiff's Claims for Punitive Damages and Survivorship Fail*

Spectrum argues that any claim for punitive damages fails because Kahl cannot establish, by clear and convincing evidence, that Spectrum acted maliciously and/or engaged

in aggravated or egregious fraud. Furthermore, both the punitive damages claim and the survivorship claim fail because they are derivative of the primary claims that have failed. (Defs. MSJ at 992.) Plaintiff has not addressed this argument.

Spectrum's view is correct. It is entitled to summary judgment on counts two and three.

## IV. Conclusion

For the reasons set forth herein, plaintiff's motion for partial summary judgment (Doc. No. 85) is denied; defendants' motion for summary judgment (Doc. No. 76) is granted.

**IT IS SO ORDERED**.

Dated: March 12, 2021

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

24